# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

**LUZ N. BERRIOS-ORTIZ,**
    Petitioner,

v.

**COMMISSIONER OF SOCIAL SECURITY**,
    Defendant.

Civil No. 18-1455 (BJM)

## OPINION AND ORDER

Luz N. Berrios Ortiz ("Berrios") moves to reverse the Commissioner of the Social Security Administration's ("the SSA's") decision to redetermine and terminate her Social Security Disability Insurance benefits ("SSDI"). Dkts. 27, 30. The SSA defended its decision. Dkts. 28, 32. The case is before me by consent of the parties. Dkts. 4, 7.

For the following reasons, the SSA's decision is **REVERSED.**

## STANDARD OF REVIEW

The court's review of SSDI cases is limited to determining whether the SSA committed legal or factual error in evaluating a claim. *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). The SSA's findings of fact are conclusive when supported by substantial evidence. 42 U.S.C. § 405(g). Questions of law are reviewed de novo. *Coskery v. Berryhill*, 892 F.3d 1, 3 (1st Cir. 2018). After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 42 U.S.C. § 405(g).

Rather than requesting review of an initial disability determination, Berrios appeals a redetermination. "The Commissioner of Social Security shall immediately redetermine the entitlement of individuals to monthly insurance benefits under this subchapter if there is reason to believe that fraud or similar fault was involved in the application of the individual for such benefits." 42 U.S.C. § 405(u)(1)(A). "Similar fault" exists when either "an incorrect or incomplete statement that is material to the determination is knowingly made" or "information that is material

to the determination is knowingly concealed." *Id.* § 405(u)(2). "When redetermining the entitlement, or making an initial determination of entitlement, of an individual under this subchapter, the Commissioner of Social Security shall disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence." *Id.* § 405(u)(1)(B).

The Appeals Council, which issues the final administrative determination on social security cases, defines its procedures and guiding principles in the Hearings, Appeals and Litigation Law manual ("HALLEX").[1] According to HALLEX, the agency may develop a "reason to believe" an application involved fraud or similar fault as a result of (1) an SSA investigation, (2) a referral based on a criminal or other law enforcement investigation, or (3) a referral from the Office of the Inspector General at the SSA ("OIG") to the Commissioner of Social Security. HALLEX I-1-3-25(C)(4)(a) (updated Feb. 25, 2016). HALLEX states that a redetermination "based on fraud or similar fault is a re-adjudication of the individual's application for benefits." *Id.* at I-1-3-25(A). The ALJ charged with redetermining a claim may consider evidence initially submitted as well as new, material evidence that does not involve fraud or similar fault and is related to the period at issue. *Id.* at I-1-3-25(A). An ALJ generally decides "whether to disregard evidence based solely on whether there is reason to believe similar fault was involved," but an ALJ assigned to redetermine a claim may also be instructed to disregard certain evidence. *Id.* at I-2-10-10(A), Note 1 (updated June 25, 2014). Evidence to be considered can be divided between initial evidence, submitted for the original claim, and new evidence that a beneficiary may submit for the redetermination. A beneficiary may submit additional evidence if it is "new, material, and related to the time period at issue." *Id.* at I-1-3-25(C)(4)(c). The time period at issue in a redetermination runs from the disability onset date through the date of the final benefits determination. *Id.* at I-1-3-25(C)(3). "Evidence that post-dates the original determination or decision can relate to the period at issue if it is reasonably related to the time period originally adjudicated." *Id.* at I-1-3-25(C)(4)(c).

---

[1] HALLEX, the Hearings, Appeals and Litigation Law manual, can be located online at https://www.ssa.gov/OP_Home/hallex/hallex.html.

The adjudicator then determines, based on the eligible evidence, whether the beneficiary was or was not entitled to benefits at the time of the original determination.

Should the Commissioner determine "that there is insufficient evidence to support such entitlement, the Commissioner of Social Security may terminate such entitlement and may treat benefits paid on the basis of such insufficient evidence as overpayments." 42 U.S.C. § 405(u)(3).

## BACKGROUND

The following is a summary of relevant portions of the treatment record, consultative opinions, self-reported symptoms and limitations as contained in the Social Security transcript and case history.

Berrios was born on May 25, 1981. Ex. 1E at 1. She completed her high school education and became a licensed practical nurse. Transcript ("Tr.") 38–39; Ex. 2E at 3. When she was 27 years old, Berrios suffered from a stroke and was hospitalized for approximately one month. Ex. 1F at 1; Ex. 11F at 1. An MRI revealed "chronic deep white matter changes" in her brain, which a doctor described as "rather unusual," given her age. Ex. 1F at 1. The stroke left Berrios with paralysis on the right side of her body, speech difficulties, and loss of vision in her right eye. Ex. 11F at 1; Ex. 12F at 4. She completed physical therapy but retained weakness in her right extremities. Tr. 40; Ex. 12F at 2. Berrios also developed depression and thoughts of suicide and reported hearing voices that told her to harm herself. Ex. 6A at 13; Ex. 11F at 1; Ex. 18F at 6. In 2009, Berrios completed a partial psychiatric hospitalization lasting one month and thereafter sought ongoing psychiatric treatment. Ex. 11F at 1; Ex. 17F at 49–84. From 2008 to 2010, Berrios continued working as a nurse but reported missing many days of work due to hospitalizations. Tr. 43. She stopped working on May 1, 2010. Ex. 2E at 2.

Berrios applied for disability benefits on May 17, 2011 based on stroke, depression, and thyroid problems. Ex. 6A at 1. On her disability report, Berrios reported receiving treatment from several doctors, including Dr. Vivian Bonilla Felix, Dr. Jose Colon Dueno, Dr. Luis de Jesus Perez, Dr. Mayra Lopez Ortiz, Dr. Haydee Rodriguez Rivera, Dr. Luis Rodriguez Saenz, Dr. Felix Roque Velazquez, Dr. Francisco Vazquez Reillo, Dr. Miguel Rodriguez, and doctors with APS Clinics of

Puerto Rico. Ex. 2E at 4–10. While the SSA was considering Berrios's claim, the agency asked her to complete a consultative examination with Dr. Rafael Miguez Balseiro ("Dr. Miguez"), which she did. Ex. 18F.

On May 31, 2013, the SSA found Berrios disabled with an onset date of May 1, 2010. Tr. 18; Ex. 4A at 1; Ex. 21B at 1. By September 2014, however, the SSA had informed Berrios that it had redetermined her claim and found she was not disabled.[2] Ex. 12B at 1. The agency "had decided that Dr. Rafael Miguez Balseiro provided incorrect, incomplete, or fraudulent evidence . . . and that fraud or similar fault was involved in [Berrios's] application." Ex. 12B at 2. The SSA also informed Berrios that she owed the agency $31,570.00 for overpayment. *Id.*

The allegation of fraud or similar fault arose out of an investigation into social security claims in Puerto Rico that began in 2009. Employees of the Puerto Rico Disability Determination Service had warned the SSA that some doctors in Puerto Rico were submitting fraudulent medical evidence to support disability benefits claims. Dkt. 28-1 at ¶ 2 ("Barry Decl."). The SSA referred the information to its OIG, which conducted an investigation alongside the Department of Justice and the Federal Bureau of Investigation ("FBI"). *Id.* ¶¶ 2–3; Dkt. 28 at 4. Various individuals were indicted as a result. Barry Decl. ¶ 3.

A neurologist named Dr. José Hernández-Gonzalez (Dr. Hernández) pled guilty to conspiracy to make false statements to the SSA. *Id.* ¶ 4. "Dr. Hernández admitted that he would exaggerate medical complaints and symptoms in order to maximize the probability that his patients would be approved for Social Security disability insurance benefits." *Id.* He also admitted to referring patients to doctors who would "exaggerate or fabricate conditions for the patients, in order to strengthen their applications for benefits." *Id.* Dr. Miguez, to whom the SSA had referred Berrios for a consultative examination, was one of those physicians. *Id.*

---

[2] The record appears to omit some correspondence between Berrios and the SSA. It does not include notice to Berrios that her benefits would be suspended and redetermined based on a finding of fraud or similar fault. Dkt. 27 at 2. Although the record omits this notice, Berrios does not raise challenges related to insufficient notice.

Dr. Miguez himself was also indicted for making false statements to the SSA. Ex. 4B at 23. His arrest and indictment followed a criminal investigation in which an undercover agent working with the FBI secured disability benefits with Dr. Miguez's help. The agent first visited the office of Dr. Hernández. Ex. 9A at 1. Dr. Hernández's receptionist gave the agent the names of six psychiatrists she could see, including Dr. Miguez. *Id.* The agent went to Dr. Miguez, told him that she had been referred by Dr. Hernández, and stated that she was there to earn money. *Id.* The two never discussed depression or stress, but Dr. Miguez gave her a prescription for stress and provided her with a medical report describing serious symptoms of depression for use in a disability claim. *Id.*; Ex. 17B at 1. After his arrest and indictment, Dr. Miguez pled guilty to a one-count Information, admitting that he had failed to maintain a cash ledger of monies paid in connection with SSA medical visits without the intent to defraud the United States. Ex. 15B at 24. The false statements charges against him were thereafter dismissed. Ex. 17B at 2.

The SSA's response to these indictments proceeded in stages. First, it assembled a special team to review nearly 7,000 cases containing evidence from those indicted. Barry Decl. ¶ 5. These adjudicators disregarded evidence provided by those who had been criminally charged and then determined whether sufficient evidence remained to support each beneficiary's benefits. *Id.* They determined that 2,000 beneficiaries could no longer support their benefits allowances. *Id.* Next, the SSA suspended these individuals's benefits, notified them that their claims were being redetermined, and gave them ten days to submit additional evidence. *Id.* ¶ 6. On redetermination, adjudicators disregarded evidence from sources who had been criminally charged, examined any new evidence submitted, and then determined whether a beneficiary qualified for benefits. *Id.* ¶ 7. If an adjudicator determined that a beneficiary no longer qualified for benefits, the SSA notified the beneficiary and provided an opportunity to appeal the decision. *Id.* ¶ 8.

In June 2015, the SSA introduced another phase in the redetermination process for beneficiaries who had submitted evidence from Dr. Miguez. On June 19, 2015, OIG sent a memorandum to the SSA Acting Deputy General Counsel explaining that Dr. Miguez had pled guilty to a one-count Information and that charges against him for false statements to the SSA had

been dismissed. Ex. 17B at 2. OIG also explained that it had "reason to believe that fraud was involved with medical evidence submitted by [Dr. Miguez]." *Id.* at 3. The SSA determined that because "OIG did not identify specific disability claimants or, evidence submitted, supplied, or sourced by [Dr. Miguez] that would have required the agency to automatically disregard that evidence," it would review cases involving Dr. Miguez again "using SSR 00-2p to determine if fraud or similar fault was involved." Ex. 15B at 1. Under that directive, the SSA itself, rather than OIG, would conduct the fraud or similar fault analysis. *See* SSR 16-2p, 81 Fed. Reg. 13439 (March 14, 2016).[3] The SSA therefore remanded 903 redetermination cases, including Berrios's, for further review. Barry Decl. ¶ 9.

For Berrios, this meant that her claim was initially redetermined based on a fraud or similar fault referral from OIG. On initial redetermination, the SSA disregarded evidence from Dr. Miguez and found Berrios not disabled based on the evidence remaining in the record. Ex. 12B at 1. After the June 2015 OIG memorandum, the SSA reviewed Berrios's case again using its own fraud or similar fault rules. On December 2, 2015, Disability Examiner Guillermo Joya conducted a "Special Determination" to answer the following question: "Is there reason to believe that fraud or similar fault (FSF) was involved in the evidence provided by Dr. Rafael Miguez Balseiro in the claim for disability benefits filed by Luz N Berrios Ortiz[?]" Ex. 9A at 1. Disability Examiner Joya determined that the consultative examination report from Dr. Miguez was consistent with other evidence in the file and concluded that "[f]raud or similar fault was not involved in this case." Ex. 8A; Ex. 9A at 2–3. Nonetheless, he proceeded with the redetermination and found that Berrios's claim should be denied. Ex. 8A.

On July 27, 2017, Berrios appeared for a video hearing before ALJ Maryanne Poulouse at which she was represented by counsel. Tr. 35. Berrios offered testimony describing her physical limitations, depression, and related hospitalizations. Tr. 40–45. On January 16, 2018, the ALJ issued a decision denying Berrios's disability claim. Tr. 18, 28. She "followed SSR 16-2p in

---

[3] SSR 16-2p rescinded and replaced SSR 00-2p effective March 14, 2016.

determining whether . . . evidence should be disregarded due to fraud or similar fault" and did "not find evidence of similar fault." Tr. 21. She thus included evidence from Dr. Miguez as part of the record, which, she determined, did not support a finding of disability. Tr. 21, 28.

Berrios sought review with the Appeals Council, which denied her request, making the ALJ's decision the SSA's final decision. Tr. 1–4. She then filed the instant complaint, seeking federal district court review of the ALJ's disability determination and challenging related procedures. Dkt. 3.

## DISCUSSION

Berrios challenges the SSA's decision on both procedural and substantive grounds. First, she argues that, after the SSA determined that no fraud or similar fault was involved in her claim, it should have ceased the redetermination process. Failure to do so, she contends, violated (1) the Social Security Act ("the Act"), (2) the Administrative Procedure Act (APA), and (3) the Due Process Clause of the Fifth Amendment. Second, she argues that the ALJ's decision was not supported by substantial evidence.

I will first consider Berrios's statutory arguments. If, as Berrios argues, the SSA violated its statutory mandate by proceeding with a redetermination after finding that her case did not involve fraud or similar fault, then the ALJ lacked authority to issue any decision. Accordingly, this court should not be asking whether that decision was supported by substantial evidence. If, however, the SSA acted in accordance with the law in redetermining Berrios's claim, then it is appropriate to ask whether the ALJ's decision was supported by substantial evidence. Finally, only if the ALJ's decision was supported by substantial evidence will I reach Berrios's constitutional claim, in keeping with the constitutional avoidance doctrine. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *Vaqueria Tres Monjitas, Inc. v. Pagan*, 748 F.3d 21, 26 (1st Cir. 2014) ("[F]ederal courts are not to reach constitutional issues where alternative grounds for resolution are available.") (internal quotations and citation omitted).

Berrios first argues that the redetermination of her claim is barred by principles of *res judicata* animating the Act. The SSA responds that the redetermination was required by law and that *res judicata* principles are inapplicable because, in enacting 42 U.S.C. § 405(u), Congress manifested an intent to displace such principles.

The First Circuit has recognized that *res judicata* principles generally apply to SSDI adjudications. *See, e.g., Sampson v. Califano*, 551 F.2d 881, 882 (1st Cir. 1977); *see also McCuin v. Sec'y of Health & Human Servs.*, 817 F.2d 161, 172 (1st Cir. 1987) (citing *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 421–22 (1966) ("The Supreme Court has held that the law of *res judicata* is applicable to administrative proceedings when an agency is acting in a judicial capacity."); *Miranda v. Sec'y of Health, Ed. & Welfare*, 514 F.2d 996, 998 n.* (1st Cir. 1975) ("It would be wrong for the Secretary to terminate an earlier finding of disability on no basis other than his reappraisal of the earlier evidence."); 20 C.F.R. § 404.957(c)(1) (permitting dismissal by an ALJ where "[t]he doctrine of *res judicata* applies in that we have made a previous determination or decision under this subpart about your rights on the same facts and on the same issue or issues, and this previous determination or decision has become final by either administrative or judicial action"). However, courts do not "have free rein to impose rules of preclusion, as a matter of policy, when the interpretation of a statute is at hand," *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991), and there are circumstances under which it is appropriate for the SSA to revisit a prior decision. *See, e.g., Miranda*, 514 F.2d at 998 n.* ("[M]any impairments are difficult to diagnose; a proper diagnosis may require reference to the cumulative medical history. The Secretary may grant a disability on the basis of a subjective complaint and tentative diagnosis pending the accumulation over time of sufficient indicia for a more complete evaluation.") Indeed, regulations permit reopening a claim for various reasons, including "good cause." *See* 20 C.F.R. § 404.988.

With 42 U.S.C. § 405(u), Congress manifested an intent to displace *res judicata* principles that might otherwise preclude revisiting prior decisions if there is reason to believe a claim involved fraud or similar fault. *Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 810–11 (6th Cir. 2018)

(finding that section 405(u) overrides background principles of *res judicata* and authorizes reassessments of initial determinations if there is reason to believe that fraud was involved in an application); *Taylor v. Berryhill*, Civ. No. 16-044, 2018 WL 1003755, at *1 (W.D. Va. Feb. 21, 2018) (explaining that 42 U.S.C. § 405(u) overrides *res judicata* principles and finding those principles inapplicable where evidence had been disregarded based on fraud, making the second adjudication "different than merely revising an ALJ's decision based on the same information"); *Roberts v. Comm'r of Soc. Sec.*, No. 17-565, 2017 WL 5712895, at *5 (M.D. Fla. Oct. 27, 2017), *report and recommendation adopted*, 2017 WL 5714256 (M.D. Fla. Nov. 27, 2017) (finding *res judicata* inapplicable where a redetermination arose from new circumstances—the indictment of plaintiff's lawyer and the ALJ who decided his case—and where the second adjudication excluded some evidence and permitted new evidence); *Robertson v. Berryhill*, No. 16-3846, 2017 WL 1170873, at *14–15 (S.D.W. Va. Mar. 28, 2017) (explaining that *res judicata* did not bar an SSDI redetermination based on fraud because the ALJ who initially found plaintiff disabled had been indicted, the second ALJ did not consider the same exact evidence as the first, and the statutory scheme, permitting both reopening and redetermination, evidenced Congress's intent to override *res judicata* principles). Thus, *res judicata* by itself does not bar a redetermination conducted pursuant to 42 U.S.C. § 405(u).

Berrios next argues that the SSA's failure to cease redetermining her claim after concluding that neither fraud nor similar fault was involved must be set aside because it was arbitrary, capricious, and not in accordance with law. The SSA disagrees, contending that it acted pursuant to Congress's requirements for redeterminations.

It is axiomatic that an agency can only act pursuant to the authority granted by Congress. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 91 (2002) (An agency "may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law.") (internal citations and quotations omitted); *Lyng v. Payne*, 476 U.S. 926, 937 (1986) ("[A]n agency's power is no greater than that delegated to it by Congress."); *Hanover Ins. Co. v. Drake Marine*, 440 F. Supp. 686, 688 (D.P.R. 1977) ("An agency may not validly act in excess of

its powers."). This court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C). As such, if Congress did not grant the SSA authority to redetermine Berrios's claim, the redetermination must be set aside.

Congress authorized the SSA "to make findings of fact, and decisions as to the rights of any individual applying for" disability benefits. 42 U.S.C. § 405(b)(1). It also provided that these findings and decisions are generally final: "[t]he findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing." *Id.* § 405(h). Despite this finality provision, Congress also requires the SSA to redetermine SSDI claims under certain circumstances:

> The Commissioner of Social Security shall immediately redetermine the entitlement of individuals to monthly insurance benefits . . . if there is reason to believe that fraud or similar fault was involved in the application of the individual for such benefits, unless a United States attorney, or equivalent State prosecutor, with jurisdiction over potential or actual related criminal cases, certifies, in writing, that there is a substantial risk that such action by the Commissioner of Social Security with regard to beneficiaries in a particular investigation would jeopardize the criminal prosecution of a person involved in a suspected fraud.

*Id.* § 405(u)(1)(A). To redetermine a claim under this section, the SSA must have some "reason to believe" that fraud or similar fault was involved. Courts have rarely interpreted the "reason to believe" standard of section 405(u), but the Sixth Circuit has explained that this standard requires "something less than proof of fraud." *Hicks,* 909 F.3d at 809. Generally, a "reason to believe" standard requires that a belief be objectively reasonable. *See* "Believe (Reasonably Believe)," *Black's Law Dictionary* (11th ed. 2019) ("Reasonably believe" means "to believe (a given fact or combination of facts) under circumstances in which a reasonable person would believe"); *see also Terry v. Ohio*, 392 U.S. 1, 27 (1968) (in the criminal context, "reason to believe" requires something more than an "inchoate and unparticularized suspicion or hunch." The relevant government official must make "specific reasonable inferences" based on the facts and his or her experience.). The SSA has not published guidance on what it considers sufficient "reason to

believe" to trigger redetermination under section 405(u)(1)(A). However, the agency has explained how it interprets "reason to believe" pursuant to section 405(u)(1)(B), which requires the SSA to disregard evidence "if there is reason to believe that fraud or similar fault was involved in the providing of such evidence." *See* 81 Fed. Reg. at 13440. According to the SSA, in that context "[a] finding of similar fault can be made only if there is reason to believe that, based on a preponderance of the evidence, the person committing the fault knew that the evidence provided was false or incomplete." *Id.* Such a finding cannot rest "on speculation or suspicion." *Id.* The agency states that the "preponderance of evidence" means "such relevant evidence that as a whole shows that the existence of a fact to be proven is more likely than not." *Id.* Whether or not the same preponderance standard would apply to the "reason to believe" under section 405(u)(1)(A), the agency acting under that provision must have "reason" to believe a claim involved fraud or similar fault and cannot redetermine claims based merely on a hunch, suspicion, or desire for administrative efficiency. *See also Puerto Rico Sun Oil Co. v. E.P.A*., 8 F.3d 73, 77 (1st Cir. 1993) ("[A]n agency decision must . . . be rational.").

Here, whether the SSA ever had "reason to believe" that fraud or similar fault was involved in Berrios's claim is arguable. The FBI had conducted an investigation indicating that Dr. Miguez would prepare fraudulent reports for submission to the SSA when patients were referred to him by Dr. Hernández. A plea agreement by Dr. Hernández corroborated this investigation. Dr. Miguez was indicted for false statements to the SSA and pled guilty to a one-count information. False statements charges were subsequently dismissed with prejudice. These facts permit an inference that Dr. Miguez sometimes prepared fraudulent reports for submission to the SSA and thus provide reason to believe that, in some instances, evidence from Dr. Miguez would involve fraud or similar fault. However, the facts permitting that inference are rather different than those in Berrios's case. In the FBI investigation, the undercover operative was referred to Dr. Miguez by Dr. Hernández, who admitted that he was intentionally helping patients exaggerate their symptoms for purposes of obtaining disability benefits. The agent also expressly informed Dr. Miguez both that she had been referred by Dr. Hernández and that she was in financial difficulties and seeing him to make

money. Ex. 9A at 1. Berrios, on the other hand, was referred to Dr. Miguez by the SSA for a consultative examination. She presumably never would have had any contact with Dr. Miguez had it not been for the SSA itself. *See* 20 C.F.R. § 404.1519 ("A consultative examination is a physical or mental examination or test purchased for you at [the SSA's] request and expense."). It requires some stretch of logic to conclude that Dr. Miguez's fraudulent behavior with respect to patients referred by Dr. Hernández provided reason to believe that every report he prepared involved fraud or similar fault, particularly where, as here, the SSA itself requested the report. That the SSA ever had reason to believe that fraud or similar fault was involved in Berrios's claim, therefore, is not obvious. *See also Hicks*, 909 F.3d at 801 (referring to the "considerable liberties that the SSA has taken in interpreting and administering the 'reason to believe' standard"). However, because Berrios appears to concede that Dr. Miguez's indictment may have provided sufficient reason to believe that fraud or similar fault was involved in her case, I will assume that at some point the SSA had the requisite "reason to believe" to commence redetermination. Dkt. 27 at 7.

The relevant question, then, is not whether the SSA ever had authority to conduct a redetermination, but whether it had continuing authority to redetermine Berrios's claim once it no longer had reason to believe fraud or similar fault was involved in her case. The SSA contends the statute requires it to redetermine a claim even in the absence of a continuing reason to believe fraud or similar fault was involved. I disagree.

Where an agency action is based on the agency's interpretation of a statute it administers, the court's review is governed by the two-step *Chevron* doctrine. "First, applying the ordinary tools of statutory construction, the court must determine 'whether Congress has directly spoken to the precise question at issue,'" and if so, "'give effect to the unambiguously expressed intent of Congress.'" *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 296 (2013) (quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)). But "if the statute is silent or ambiguous" on the matter, then the court need only determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* Moreover, an agency's interpretation of its own regulations is of "controlling weight unless it is plainly erroneous or inconsistent with the

regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal citations and quotations omitted). No deference is due where "Congress has supplied a clear and unambiguous answer to the interpretive question at hand." *Pereira v. Sessions*, 138 S. Ct. 2105, 2113 (2018).

"The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Saysana v. Gillen*, 590 F.3d 7, 12–13 (1st Cir. 2009) (quoting *INS v. Cardoza–Fonseca*, 480 U.S. 421, 447–48 (1987)). Courts "discern congressional intent by examining the language, structure, purpose, and history of the statute." *Irobe v. United States Dep't of Agric.*, 890 F.3d 371, 378 (1st Cir. 2018) (internal quotations and citations omitted).

Here, the SSA's interpretation of the redetermination process established by Congress contradicts the plain language of the statute and is therefore entitled no deference. Section 405(u) provides for redeterminations "if there is reason to believe that fraud or similar fault was involved" in an individual's benefits application. 42 U.S.C. § 405(u)(1)(A). This provision makes no reference to redeterminations in the absence of a reason to believe fraud or similar fault was involved. Rather, section 405(u) focuses exclusively on claims where benefits were procured by wrongdoing. Section 405(u)(1)(A) requires redetermination in cases of fraud or similar fault, section 405(u)(1)(B) requires the SSA to disregard evidence under the same circumstances, and section 405(u)(2) explains that "similar fault" is involved where "an incorrect or incomplete statement that is material to the determination is knowingly made or information that is material to the determination is knowingly concealed." None of these sections contemplates a situation where a claimant's application was entirely free of fault. Rather, Congress took pains to ensure the SSA understood that a redetermination under this section required some level of wrongdoing, defining "similar fault" as fault that could only be committed "knowingly," not by chance or mistake. In other words, section 405(u) evinces an intent to identify claims where wrongdoing, in

the form of fraudulent or knowing concealment, supported the procurement of benefits. It creates no authority to revisit claims procured without any fraud or concealment.

Further, to read section 405(u) to require redetermination even where the agency lacks reason to believe fraud or similar fault was involved would be to undermine section 405(h). That section, titled "finality of the Commissioner's decision," provides that "[t]he findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing." It also establishes that the SSA may not review its own decision unless an exception applies: "No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided." 42 U.S.C. § 405(h). Thus, section 405(h) creates a general rule promoting the finality of the SSA's decisions, and section 405(u) creates a limited exception to that rule. *See Robertson*, 2017 WL 1170873, at \*15 ("Section 405(h) provides for specific exceptions to reviewing final determinations, and the redetermination process is one of those exceptions."). To read section 405(u) to permit redeterminations even after the agency has concluded it has no reason to believe a claim involved fraud or similar fault would be to permit the exception to swallow the rule. Claimants whose applications for disability benefits had been approved could never enjoy the repose that section 405(h) attempts to provide because, if the agency temporarily but mistakenly suspects them of fraud, their benefits, acquired without any wrongdoing, could be redetermined and terminated based on the agency's mistake alone. *See also McCuin*, 817 F.2d at 174 (explaining that it would frustrate congressional objectives to construe the Act to put "claimants in a state of limbo . . . uncertain of the final outcome of their cases.").

Indeed, the SSA's reading of the statute not only contradicts its plain language but undermines its purpose. Congress established Social Security after deciding that "American workers need[ed] a federal program of social insurance protecting them in old age and disability." *Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 51 (1986). "[T]he primary objective was to provide workers and their families with basic protection against hardships created by the loss of earnings due to illness or old age." *Mathews v. De Castro,* 429 U.S. 181, 185–86

(1976). Courts have thus recognized that "the Social Security Act is to be construed liberally to effectuate its general purpose of easing the insecurity of life." *Rodriguez v. Celebrezze*, 349 F.2d 494, 496 (1st Cir. 1965); *see also McCuin*, 817 F.2d at 174 ("[T]he Social Security Act . . . is a remedial statute, to be broadly construed and liberally applied in favor of beneficiaries."). Congress advanced its objective of alleviating hardships created by disability when it enacted the Social Security Independence and Program Improvements Act of 1994. This Act established the redetermination procedures in section 405(u), expanding the SSA's authority "to prevent, detect, and terminate fraudulent claims." Social Security Independence and Program Improvements Act of 1994, Pub. Law No. 103–296, 108 Stat. 1464. "[T]he general purpose of § 405(u) was to enable the SSA to end fraudulent determinations more quickly than the reopening procedures at that time allowed." *Hicks,* 909 F.3d at 813 (internal quotation and citation omitted). By providing the agency with improved ability to address cases of fraud, section 405(u) would help ensure that federal resources were directed toward workers who were genuinely experiencing hardship due to illness. Thus, in enacting section 405(u)(1)(A), Congress described its purpose as granting the SSA "authority to redetermine eligibility *if fraud is involved*." Pub. Law No. 103–296, 108 Stat. 1464 (emphasis added). Congress did not describe its purpose as creating a general power in the SSA to revisit claims that had already been approved even though such claims involved neither fraud nor similar fault.

Moreover, in its memorandum the SSA fails to cite any case in which it had redetermined an individual's benefits even after determining it lacked reason to believe fraud or similar fault was involved, nor has the SSA cited any prior agency interpretation contemplating redetermination in the absence of this "reason to believe." Rather, the interpretations of section 405(u) the SSA issued prior to the current litigation only contemplate redeterminations in the context of fraud or similar fault. Thus, HALLEX provides that the "SSA will redetermine cases *when there is reason to believe that fraud or similar fault was involved* in an individual's application for monthly disability benefits." HALLEX I-1-3-25(B)(1) (emphasis added). Social Security Ruling ("SSR") 16-1p "explains the process [the SSA] use[s] to redetermine an

individual's entitlement to or eligibility for benefits *when there is reason to believe that fraud or similar fault was involved* in that individual's application for benefits." SSR 16-1p, 81 Fed. Reg 13436 (March 14, 2016) (emphasis added). And SSR 16-2p "explain[s] the rules that govern the evaluation and adjudication of claims *when there is reason to believe similar fault was involved* in the providing of evidence in support of the claim." 81 Fed. Reg. at 13439 (emphasis added). It is only here, in litigation, that the SSA asserts it has authority to redetermine a claim even after concluding the application involved neither fraud nor similar fault. That interpretation is not entitled to deference because it contradicts the plain language of the statute, and it is inconsistent with prior agency interpretations. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125–26 (2000); *All. To Protect Nantucket Sound, Inc. v. U.S. Dep't of Army*, 398 F.3d 105, 112 n.5 (1st Cir. 2005) ("[D]eference is not due to interpretations that are post hoc rationalizations offered by an agency seeking to defend past agency action against attack."); *Passamaquoddy Tribe v. State of Me.*, 75 F.3d 784, 793 (1st Cir. 1996) ("It is transpicuously clear that, under *Chevron*, no deference is due if Congress has spoken directly to the question.").

In sum, section 405(u)(1)(A) requires redetermination if there is reason to believe a claim involved fraud or similar fault. It does not grant authority to redetermine a claim once the agency has no reason to believe fraud or similar fault was involved. Thus, once Disability Examiner Joya concluded that "[f]raud or similar fault was not involved in this case," he lacked authority to continue with any redetermination. Ex. 8A. Similarly, upon the ALJ's conclusion that she found no evidence of similar fault in Berrios's claim, she lacked power to act under section 405(u). The purported redetermination and related assessment were therefore beyond the scope of authority Congress granted under 42 U.S.C. § 405(a)(1)(A). They must be set aside and the status quo prior to the SSA's unlawful redetermination restored. 5 U.S.C. § 706(a)(2).

Because the ALJ lacked congressional authorization to issue her decision, I will not ask whether that decision was supported by substantial evidence. Nor will I reach Berrios's constitutional arguments.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **REVERSED**. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 23rd day of September, 2019.

                                                 *S/ Bruce J. McGiverin*
                                                 BRUCE J. MCGIVERIN
                                                 United States Magistrate Judge